UNITED STATES of America, Small Business Administration, Plaintiff–Appellee,

Truduax Corporation, Claimant–Appellant,

v.

VANGUARD INVESTMENT COMPANY, INC., Defendant.

No. 92–2376.

United States Court of Appeals, Fourth Circuit.

Argued June 11, 1993.

Decided Oct. 4, 1993.

---

Ben Hill Sirmons, Jr., Frazier, Frazier & Mahler, Greensboro, NC, argued (Torin L. Fury, on brief), for claimant-appellant.

Mark William Vita, Chief Counsel, SBIC Claims and Commercial Transactions, U.S. Small Business Admin., Washington, DC, argued, for plaintiff-appellee.

Before RUSSELL and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

PHILLIPS, Circuit Judge:

Trudaux Corporation (Trudaux) appeals from an order granting summary judgment against it and for the Small Business Admin-

istration (SBA) as receiver for Vanguard Investment Company. Vanguard is a corporation being wound up on order of the district court pursuant to the relevant provision of the Small Business Investment Act (SBIA), 15 U.S.C. §§ 687c. In the claims filing phase of that proceeding, Trudaux sought classification as a creditor of Vanguard, alleging that it was fraudulently induced to subscribe to Vanguard preferred stock and therefore was entitled to rescission of the subscription contract and restitution of $250,000 conferred pursuant to it or, alternatively, that Vanguard breached a contract with it to convey common stock by failing to deliver any stock, entitling Trudaux to contractual damages. Acting as receiver, the SBA rejected Trudaux's creditor claim, reasoning that Trudaux was simply a shareholder in Vanguard entitled to participate in the distribution of Vanguard's remaining assets at the close of winding up. The district court ratified the SBA's decision after concluding that North Carolina law barred any claim to creditor status by a stock subscriber such as Trudaux.

We conclude that the district court misapplied North Carolina law in holding that Trudaux's subscriber status prevented it from claiming status as a creditor. This requires that we vacate and remand with instructions for consideration of Trudaux's alternative claims for rescission of the subscription agreement and restitution of the amount paid under it, or for damages for breach of that agreement.

## I

As did the district court, we recite and consider the facts of this dispute in the light most favorable to the nonmovant Trudaux on this appeal from entry of summary judgment. *United States ex rel. Global Bldg. Supply, Inc. v. WNH Ltd. Partnership*, 995 F.2d 515, 517 (4th Cir.1993).

A North Carolina corporation, Vanguard was licensed by the SBA as a small business investment company in 1970. From 1974 through 1979, the SBA purchased from Van-

guard $1,270,000 in subordinated debentures and $500,000 in preferred stock.

In May of 1985, John Edmonds, Vice President of Trudaux, entered into an oral agreement with Vanguard's two principal officers, David Wagner and Lee Andrews, under which Trudaux would invest $250,000 in Vanguard in exchange for the issuance of common stock in Vanguard and its transfer to Trudaux.

Wagner and Andrews told Edmonds Vanguard needed the investment immediately to satisfy certain asset requirements of the SBA, so Trudaux immediately transferred to Vanguard real property with an assessed value of $250,000. Wagner and Andrews told Edmonds that the issuance of shares had to be approved by the Board of Directors but also maintained that approval would be forthcoming in the near future.

Vanguard's books reflect the $250,000 capital infusion as preferred stock issued between March 31, 1985 and March 31, 1986, but no certificates of any kind were issued to Trudaux and no dividends were paid to it. Moreover, Trudaux lacked knowledge that Vanguard's books reflected its investment as preferred stock.[1] So when the common stock still wasn't issued to Trudaux a few months later, Edmonds contacted Wagner and Andrews, making a number of demands for its issuance. Wagner and Andrews refused those demands, but they did make an offer to issue preferred stock, which Edmonds declined. Trudaux then retained counsel, and in June of 1986 that counsel wrote Wagner, demanding return of Trudaux's $250,000 investment with interest from the time of transfer. Edmonds himself made a similar demand at Vanguard's September 1986 annual meeting. Neither achieved results.

Trudaux was preparing a state court lawsuit against Vanguard to recover its investment when the United States District Court for the Middle District of North Carolina issued a temporary restraining order on June 16, 1987 barring suits against Vanguard. The SBA had sought the TRO, alleging that

---

1. In fact, it didn't learn of this at all until the receiver sought summary judgment against it on the claim to creditor status here in issue.

Vanguard was violating the SBIA and regulations promulgated thereunder. The district court ultimately agreed and committed Vanguard to receivership pursuant to 15 U.S.C. § 687c, appointing the SBA receiver.

In July 1991 the district court ordered the SBA to solicit claims against Vanguard and the receivership and wind up their affairs. Pursuant to that solicitation, Trudaux filed a claim for $250,000 plus interest on August 16, 1991.

In March 1992 the SBA moved to establish the priority and amount of all claims against Vanguard for summary disposition. The motion rejected Trudaux's claim to creditor status and classified it as a preferred stockholder entitled to share in the distribution of corporate assets on the conclusion of winding up. Trudaux objected, seeking either permission to institute a civil suit against Vanguard or classification as a creditor. The SBA replied, seeking summary judgment on Trudaux's claim which the district court granted. Trudaux then took this appeal following the district court's certification of the judgment as final with respect to Trudaux's claim pursuant to Fed.R.Civ.P. 54(b).

## II

Although the parties' positions on this appeal are not altogether clear and consistent, we identify the principal issue to be decided as this: Is Trudaux a creditor of Vanguard with a cognizable claim against the receivership, or is it simply a shareholder entitled to a ratable share of the corporate assets when the winding up concludes? Trudaux claims the former status, relying, as it properly may at this stage, on logically inconsistent alternative theories. First, Trudaux claims entitlement to rescind the subscription contract for fraud and secure restitution of the value it conferred on Vanguard, along with appropriate interest. Alternatively, Trudaux

claims a breach of the subscription contract by Vanguard entitling it to compensatory damages.[2] The SBA rejects both predicates for creditor status as inadequate and contends that, absent a judgment awarding Trudaux rescission or damages rendered prior to the district court's imposition of receivership, Trudaux is just another unfortunate shareholder in financially strapped Vanguard.

## A

■ We first consider the district court's rationale for granting summary judgment for the SBA. As indicated, the court granted summary judgment based on N.C.Gen.Stat. § 55–43(*l*) which provides.[3]

[n]o provision in any subscription shall, as against creditors, entitle the subscriber to the status of creditor with respect to any amount theretofore or thereafter paid under the terms of the subscription.

The district court concluded that § 55–43(*l*) bars any claim to the status of creditor by Trudaux with respect to the $250,000 previously paid under the terms of the subscription.

Trudaux, however, argues that § 55–43(*l*) doesn't apply here, because Trudaux's entitlement to creditor status arises not from *a provision in the subscription agreement,* the basis to which the statute speaks, but from Vanguard's fraud or breach of contract. According to Trudaux, § 55–43(*l*) was designed to prevent large subscribers from protecting themselves at the expense of smaller shareholders by permitting the former to treat their subscriptions as loans if a corporation were to fail but allowing them to reap the benefits of shareholder status if it were to prosper. Trudaux sought no such protection in its subscription agreement, the argument goes, so the statute doesn't apply.

**2.** Trudaux also suggests that even if it isn't a creditor, the other shareholders' interests should be equitably subordinated to its own as a matter of fairness. The SBA counters that fairness requires no such result, because Trudaux is simply trying to evade a bad bargain.

**3.** North Carolina rewrote its business corporation law after this dispute arose (amendments

effective July 1, 1990) and repealed the provisions discussed in this opinion, replacing them with others. Potential liabilities arising under the old law are unaffected by the new Business Corporations Act, however, N.C.Gen.Stat. § 55–17–03(a) (1990), so we write as if the old statutory provisions, which the parties agree govern this dispute, were still in effect.

The SBA counters that the statute does apply, because Trudaux can't claim creditor status without an adjudicated claim—which it unquestionably doesn't have—or reliance on a provision of the subscription agreement.

We agree on this point with Trudaux. Creditor status doesn't require an adjudicated claim; most creditors have no such thing. It does require, in this case, some reliance on the subscription agreement—albeit not a *provision in* the agreement—in the sense that Trudaux's claim must be based on either fraudulent inducement of that agreement or its breach. But the statute doesn't bar all *claims* involving monies paid under subscription agreements; it merely denies enforcement to subscription agreement *provisions* that *entitle* subscribers to creditor status. This agreement contains no such provision; any claim by Trudaux to creditor status arises not from a provision in its subscription agreement, but from alleged wrongful conduct by Vanguard.

Section 55–43(*l*) is designed to prevent "sweetheart" subscription contracts which themselves transform the subscription payment into a credit under certain adverse conditions, insulating the subscriber from loss. Trudaux obviously is attempting to avoid loss but not by reliance on any provision in the subscription agreement. And nothing in the text of § 55–43(*l*) or the policy behind it suggests an absolute bar to claims by a subscriber simply because the claim involves a subscription agreement or monies paid thereunder.

Accordingly, we hold that this statute does not of itself bar Trudaux from making the claims here in issue. That says nothing about their merits, which the district court of course did not reach, but which the parties, in anticipation of a possible reversal on the principal issue, have briefed and argued. We cannot resolve those claims on this appeal, but believe that some guidance for their consideration on remand is warranted.

## B

■ We first address the claim for rescission and restitution, Trudaux's obviously preferred remedy. The parties have argued the availability of those forms of relief wholly in terms of whether they're available under state law. That of course could be dispositive if they're not; but even if entitlement under state law *could be established, that* wouldn't end the matter in this federal receivership. Given its equitable nature and purposes, a district court supervising such a receivership has the discretionary power to deny these equitable remedies as inimical to receivership purposes even though they are or might be warranted under controlling law.

The Eleventh Circuit recently explained why this must be so in *SEC v. Elliott,* 953 F.2d 1560 (1992). *Elliott* involved a number of investors seeking in a federal receivership rescission of certain investment agreements allegedly procured by fraud, and restitution of the securities they had transferred to the defrauder pursuant to those agreements. *Id.* at 1569. Rescission and restitution were clearly appropriate under ordinary contract remedy principles, because the securities involved were traceable and had remained in possession of the receiver, but the district court had permitted the receiver to deny those forms of relief after concluding that

> [t]o allow any individual to elevate his position over that of other investors similarly "victimized" by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less.... [I]n the context of this receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy.

*Id.* (quoting unpublished district court order establishing final settlement of claims and distribution of receivership assets). The Eleventh Circuit affirmed, concluding that the district court's decision was well within the "broad powers and wide discretion to determine the appropriate relief in an equity receivership" conferred on the district courts. *Id.* at 1569–70.

*Elliott* relied in part on a similar approach taken by a district court of this circuit in *CFTC v. Franklin,* 652 F.Supp. 163 (W.D.Va. 1986), *rev'd on other grounds sub nom., Anderson v. Stephens,* 875 F.2d 76 (4th Cir. 1989). In *Franklin,* the district court rejected the claims in receivership of certain defrauded investors to restitution of their traceable contributions. Because these investors were in the same equitable position as other investors who could by chance no longer trace their fraudulently induced contributions out of the common pool, the district court denied the former investors the tracing relief they sought (imposition of a constructive trust) after concluding it would be inequitable to give them more than the *pro rata* share the remaining investors would receive. *Franklin,* 652 F.Supp. at 168. Although we reversed that judgment based on our conclusion that the plaintiff investors weren't in fact similarly situated with the others, we did not disapprove the general approach taken by the district court.

We reaffirm that position here, holding that a district court in its discretionary supervision of an equitable receivership may deny remedies like rescission and restitution where the equities of the situation suggest such a denial would be appropriate. We express no opinion on the appropriateness of such a denial in this case; Trudaux's position may be sufficiently distinct from the positions of the claimants in *Elliott* and *Franklin* to make those decisions not persuasive on the question. And of course, we leave to the district court the order in which to consider the two possible barriers to rescissionary and restitutionary relief: state law and federal equitable discretion. We merely note that various issues of state law must be resolved if the availability of these remedies under that body of law is directly addressed. These include (1) whether the necessary predicate of fraud has been established; (2) whether Trudaux irrevocably elected to pursue non-rescissionary relief; (3) whether the competing rights of other shareholders have foreclosed rescissionary relief; (4) whether Trudaux affirmed the subscription contract; and (5) whether the relief is barred by the applicable statute of limitations or laches. These might of course be addressed head-on,

or entitlement under state law might be assumed as a predicate for the exercise of equitable discretion if the remedies are to be denied on that basis.

### C

If the district court for any reason disallows rescissionary relief, we assume that Trudaux will continue to press its alternative position that Vanguard breached the subscription contract, entitling Trudaux to compensatory damages. We discuss that claim briefly here for the guidance of the district court on remand.

██ The first issue raised in connection with that claim is one that we can dispose of at this point as a matter of law. It is whether, as the SBA apparently has contended, claims for breach of contract not reduced to judgment before receivership aren't cognizable against the defaulting entity once it's in receivership. We reject that position. To be cognizable in receivership, claims must ordinarily be timely and either certain or "capable of being made certain by recognized methods of computation." *First Empire Bank–New York v. FDIC,* 572 F.2d 1361 (9th Cir.1978) (quoting *Pennsylvania Steel Co. v. New York City Ry. Co.,* 198 F. 721, 738 (2d Cir.1912)), *cert. denied,* 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978). Claims for breach of contract typically qualify if allowing their proof won't delay distribution. *See Irving Trust Co. v. Compania Mexicana de Petroleo,* 66 F.2d 390, 393 (2d Cir.1933), *cert. denied,* 291 U.S. 661, 54 S.Ct. 377, 78 L.Ed. 1052 (1934); *cf. National Sur. Corp. v. Sharpe,* 236 N.C. 35, 72 S.E.2d 109 (1952) (disallowing breach of contract claim for failure to prove). Since this receivership is an equitable one imposed by a federal court having exclusive jurisdiction over claims against the entity in receivership, *see* 15 U.S.C. § 687c(b), proving those claims without delaying distribution poses no problems. That this claim hasn't been reduced to judgment doesn't therefore of itself prevent its assertion in this receivership. The merits of the claim are therefore properly before the receivership court.

As to the merits, we offer the following points for the district court's consideration.

As we understand Trudaux's alternative claim for damages for contract breach—hence an allowable creditor claim—it also (at least by implication) proceeds on alternative theories. Under the first, the breach asserted is the failure to deliver any shares, common or preferred. On this view of things, Trudaux contends, relying on *Corporation Comm'n v. Harris,* 197 N.C. 202, 148 S.E. 174 (1929), that it never became a shareholder of any kind, that Vanguard's breach of its promise to issue shares in return for money was total. To this, SBA responds that no such total breach occurred, that Vanguard's entry on its book of the issuance of preferred stock constituted performance under the subscription agreement, since it effectively made Trudaux a preferred shareholder of the corporation.

If this position of the SBA is correct, it would yet leave open—though of course not proven—an alternative claim of contract breach: that what was promised was common stock, while what was effectively issued was preferred stock; not a total breach but not complete performance.

If breach were established under either theory—and it is of course disputed as to both—there would remain the issue of the damages provable under that theory as determinative of the amount of the allowable creditor claim that would result. That requires looking to the appropriate measure of damages for the breach alleged.

■ In North Carolina, as generally, the measure of damages for contract breach is "The pecuniary difference between [the claimant's] position upon the breach of the contract and what it would have been had the contract been performed." *Troitino v. Goodman,* 225 N.C. 406, 35 S.E.2d 277, 282 (1945). Under this rule, if Trudaux was entitled to common stock worth $250,000 at time of subscription and got nothing, the measure of its damages would be the value of that amount of common stock upon completion of winding-up; i.e. the value of a share of corporate assets available for distribution to one who then owned that amount of common stock.

■ If, on the other hand, Trudaux was entitled at subscription to common stock worth $250,000 and got not that but preferred stock then worth $250,000, it would be a preferred shareholder but also a creditor with an allowable claim for any difference in value at the conclusion of winding-up between an investment at subscription time in $250,000 worth of common stock and a comparable investment at that time in preferred stock.

It thus is obvious that Trudaux's ability to prove any damages at all from either breach is dependent upon the existence at the conclusion of winding-up of some corporate assets for distribution to shareholders.[4] For this reason, it is possible that decision on the claims for contract breach might properly be deferred until it is possible to determine whether there will be such assets, and that the claims could be dismissed once it were determined that there would not be, without the necessity to address the issues of breach. But that we leave to the district court.

### III

For the reasons expressed above, we vacate the district court's entry of summary judgment and remand for further proceedings consistent with this opinion. On remand, the district court should first determine Trudaux's claim of entitlement to the remedies of rescission and restitution for Vanguard's alleged fraud in inducing the stock subscription agreement. If those remedies are determined to be either equitably inappropriate or legally unavailable, the district court should then determine Trudaux's breach of contract claim. If both claims are resolved against Trudaux, the district court may simply reinstate its earlier judgment that Trudaux take a ratable distribution of

---

4. Trudaux's professed desire to gain control of the corporation via its common stock has no value in money damages, especially where control of the corporation has been vested in a receiver and the corporation is being wound up and will not emerge from that supervision.

the receivership assets as a holder of $250,-000 in preferred stock.

*SO ORDERED.*