**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-2256

CCWB ASSET INVESTMENTS, LLC; M.C. DEAN, INC.,

Claimants – Appellants,

EBC ASSET INVESTMENT, LLC; JEFFREY J. CONNAUGHTON; IWONA HOWLEY; RICHY CASTRO; TONY DAVIS; ROCHELLE KATZ; BARBARA LOUDERBACK; SCOTT D. OSER; OJAS PATEL; PULIN PATEL; DHAVAL SHUKLA; NISHANT SHUKLA,

Claimants,

and

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

UNITED STATES OF AMERICA,

Intervenor/Plaintiff,

MASSACHUSETTS ATTORNEY GENERAL,

Intervenor,

v.

GREGORY S. MILLIGAN,

Receiver – Appellee,

RANDEL LEWIS,

Receiver,

and

KEVIN B. MERRILL; JAY B. LEDFORD; CAMERON R. JEZIERSKI; GLOBAL CREDIT RECOVERY, LLC; DELMARVA CAPITAL, LLC; RHINO CAPITAL HOLDINGS, LLC; RHINO CAPITAL GROUP, LLC; DEVILLE ASSET MANAGEMENT LTD; RIVERWALK FINANCIAL CORPORATION; AMANDA MERRILL; LALAINE LEDFORD; MAUREEN STEPHENS; ERICKA JOHNSON,

Defendants.

----

**No. 22-2296**

----

JEFFREY J. CONNAUGHTON; TONY DAVIS; ROCHELLE KATZ; BARBARA LOUDERBACK; SCOTT D. OSER; OJAS PATEL; PULIN PATEL; DHAVAL SHUKLA; NISHANT SHUKLA,

Claimants – Appellants,

CCWB ASSET INVESTMENTS, LLC; EBC ASSET INVESTMENT, LLC; M.C. DEAN, INC.; IWONA HOWLEY; RICHY CASTRO,

Claimants,

and

SECURITIES & EXCHANGE COMMISSION,

Plaintiff,

UNITED STATES OF AMERICA,

Intervenor/Plaintiff,

MASSACHUSETTS ATTORNEY GENERAL,

Intervenor,

v.

2

GREGORY S. MILLIGAN,

                    Receiver – Appellee,

RANDEL LEWIS,

                    Receiver,

        and

KEVIN B. MERRILL; JAY B. LEDFORD; CAMERON R. JEZIERSKI; GLOBAL
CREDIT RECOVERY, LLC; DELMARVA CAPITAL, LLC; RHINO CAPITAL
HOLDINGS, LLC; RHINO CAPITAL GROUP, LLC; DEVILLE ASSET
MANAGEMENT LTD; RIVERWALK FINANCIAL CORPORATION;
AMANDA MERRILL; LALAINE LEDFORD; MAUREEN STEPHENS; ERICKA
JOHNSON,

                    Defendants.

———————————————

Appeals from the United States District Court for the District of Maryland, at Baltimore.
Richard D. Bennett, Senior District Judge.  (1:18-cv-02844-RDB)

———————————————

Argued:  January 25, 2024                           Decided:  August 6, 2024

———————————————

Before KING and BENJAMIN, Circuit Judges, and KEENAN, Senior Circuit Judge.

———————————————

Affirmed by published opinion.  Judge Benjamin wrote the opinion, in which Judge King
and Judge Keenan joined.

———————————————

**ARGUED:**  Monica Evan Miller, CUNEO GILBERT & LADUCA, LLP, Washington,
D.C.; Rachel M. Clattenburg, LEVY FIRESTONE MUSE LLP, Washington, D.C., for
Appellants.  Daniel G. Solomon, HUSCH BLACKWELL LLP, Washington, D.C., for
Appellee.  **ON BRIEF:**  Robert F. Muse, Ronald Kovner, LEVY FIRESTONE MUSE
LLP, Washington, D.C., for Appellants CCWB Asset Investments, LLC and M.C. Dean,
Inc.  Jonathan W. Cuneo, CUNEO GILBERT & LADUCA, LLP, Washington, D.C. for
Appellants Jeffrey J. Connaughton, et al.  Buffey E. Klein, Dallas, Texas, Lynn H. Butler,

3

Jameson J. Watts, HUSCH BLACKWELL LLP, Austin, Texas, for Appellee.

_____

DEANDREA GIST BENJAMIN, Circuit Judge:

This case is about a court-appointed receiver ("Receiver") and his attempt to "divide the pie," or split funds recovered from a Ponzi scheme among swindled investors. Appellants, the "Dean Investors" and the "Connaughton Investors," appeal the district court's order approving Appellee's—the Receiver's—plan to distribute the assets. Finding no abuse of discretion in the district court's approval of the plan, we affirm.

I.

A.

Kevin Merrill, Jay Ledford, and Cameron Jezierski ("Defendants") raised over $345 million from more than 230 investors in a fraudulent scheme. They lured investors by touting significant returns from the purchase and resale of consumer debt portfolios. But instead of investing the cash as promised, they stole a portion of it and used the remainder to pay purported dividends, or "distributions," to earlier investors. Appellants, unfortunately, fell victim to the scheme.

The first group of Appellants, the Dean Investors, are institutional investors managed by Eric Dean. The group includes CCWB Asset Investments, LLC ("CCWB") and Dean Capital Investments, LLC, the wholly owned subsidiary of M.C. Dean, Inc. ("M.C. Dean").[1]

---

[1] EBC Asset Investment, Inc. ("EBC") was part of the Dean Investors group in the proceedings below, but it was voluntarily dismissed from this appeal.

5

The Dean Investors established a pattern of investing, withdrawing, and reinvesting their capital with Defendants. CCWB transacted with Defendants 57 times, with up to four months passing between its withdrawals and subsequent investments. It commingled funds from Defendants and other sources in a single bank account, and it dipped into that pool to handle unrelated expenses, such as credit card and tax payments. M.C. Dean, for its part, transacted with Defendants 19 times, but it maintained a separate bank account solely for that purpose. Both CCWB and M.C. Dean instructed Defendants to "roll over" any distributions to which they were entitled, or apply them to their investment accounts, rather than pay them out as dividends.

The second group of Appellants, the Connaughton Investors, are individual investors. The group includes Jeffrey Connaughton, Tony Davis, Barbara Louderback, Rochelle Katz, Scott Oser, Ojas Patel, Pulin Patel, Dhaval Shukla, and Nishant Shukla. The Connaughton Investors invested with Defendants through a third-party fund called the Bethesda Group, which allegedly made misrepresentations to induce their investments. The Connaughton Investors later settled a lawsuit against the Bethesda Group's organizers.

## B.

On November 6, 2018, the Securities and Exchange Commission (SEC) brought a civil action against Defendants and related parties (together, "Receivership Parties") in the District of Maryland, alleging that they violated federal securities laws.[2] The district court

---

[2] Merrill, Ledford, and Jezierski each pled guilty to related criminal charges in the District of Maryland.

froze the Receivership Parties' assets ("Receivership Assets") and appointed Gregory Milligan as the Receiver. He was tasked with recovering, liquidating, and apportioning the Receivership Assets among the defrauded investors ("Claimants").

The Receiver identified 238 undisputed claims to the funds totaling $166,022,249.69. He recovered various Receivership Assets, including real estate, luxury cars, fine art, watches, and other jewelry. The Receiver marketed and sold those assets to generate cash for the Claimants. He then created a distribution plan, which proposed five ranked categories of Claimants and a $50,000,000 interim distribution.

Two additional aspects of the plan bear noting. First, to distribute funds to Appellants' Claimant category, the Receiver recommended the "Rising Tide" method. He determined that more "Claimants will receive a greater distribution using" that approach. J.A. 243. Under the Rising Tide method, a receiver distributes the assets such that no investor recovers less than a certain percentage of her principal investment. Here, the Receiver set that percentage—"the tide"—to 48.86%.

Importantly, however, the Rising Tide method deducts from that recovery pre-Receivership withdrawals and distributions—unless they are rolled over. For instance, suppose A invests $100 in a Ponzi scheme but withdraws $50 before the scheme crumbles. Under the Rising Tide method, the receiver counts that $50-withdrawal as partial compensation for A's loss, meaning A will receive *less* from the receiver's distribution of the assets. Because the Rising Tide method requires subtracting previous withdrawals from an investor's receivership recovery, investors who make withdrawals fare worse under that method than those who withdraw nothing.

7

Second, the plan includes a "Collateral Offset Provision." Thirty-eight Claimants received a total of $2,882,787.66 from third parties to compensate them for their losses in the Ponzi scheme ("Collateral Recovery Cohort"). Under the Collateral Offset Provision, the Receiver proposed counting 100% of those payments from collateral sources as withdrawals. The Receiver determined that "[t]reating settlements and other similar recoveries as pre-Receivership withdrawals ensures . . . Claimants are treated equally with respect to the total recovery of their principal investments." *Id.* at 221.

## C.

On November 18, 2022, the district court approved the distribution plan over Appellants' objections. The Dean Investors objected to the Receiver's application of the Rising Tide method. In their view, the Receiver should not have counted the withdrawals they later reinvested as partial compensation. Instead, he should have used the "Maximum Balance" approach to the Rising Tide method. *See Sec. & Exch. Comm'n v. Huber*, 702 F.3d 903, 907 (7th Cir. 2012) ("In cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme . . . should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored."); *see also infra* Part III.A.

The district court overruled that objection. First, it reasoned that the Maximum Balance approach has "not been adopted by any other court to date." *Sec. & Exch. Comm'n v. Merrill*, Civil Action No. RDB-18-2844, 2022 WL 17582418, at *3 (D. Md. Nov. 18, 2022). Second, it found that the approach "would be extremely difficult from an administrative perspective." *Id.* And third, it noted that despite the Dean Investors'

"emphasis on their own equitable distribution," they omit that when they withdrew money, "there was a benefit from that withdrawal, however big or small." *Id.*

Next, the Connaughton Investors objected to the Collateral Offset Provision. They explained that under that provision, if a Claimant "had already received $100,000 in a [third-party] settlement, the amount of the [C]laimant's distribution" from the Receivership "will be effectively reduced by $100,000." J.A. 279. In their mind, a 100% offset disincentivizes Claimants from seeking third-party settlements. The Connaughton Investors, therefore, requested that the Receiver ignore third-party settlements, or at least not account for them on a dollar-for-dollar basis.

The district court overruled that objection, too. It found that without the Collateral Offset Provision, the Connaughton Investors "would receive a disproportionately higher recovery on their investment as compared to other victims." *Merrill*, Civil Action No. RDB-18-2844, 2022 WL 17582418, at *3 (internal quotation marks omitted). They already received an average of 57.72% of their original investments in settlement monies; meanwhile, other investors will only receive a 48.86% recovery per the tide. The offset, the court reasoned, guards against this windfall.

Appellants timely appealed the district court's order overruling their objections.

## II.

### A.

Before we address the merits of the district court's order, we must pause to determine whether it is appealable. An order approving a receiver's distribution plan is not

9

a "final" order. *See Sec. & Exch. Comm'n v. Wealth Mgmt. LLC*, 628 F.3d 323, 330 (7th Cir. 2010); *Sec. & Exch. Comm'n v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 330 (5th Cir. 2001) (holding that an order approving a distribution plan is not final because it does not "end the litigation on the merits" but "is only one part of the overall litigation by the SEC" (internal quotation marks omitted)).

Because we cannot exercise jurisdiction under 28 U.S.C. § 1291 (granting appellate courts jurisdiction over appeals from final decisions), we must determine another basis for jurisdiction. For the following reasons, we hold that the collateral order doctrine grants us jurisdiction over this appeal. *See Sec. & Exch. Comm'n v. Torchia*, 922 F.3d 1307, 1316 (11th Cir. 2019); *Wealth Mgmt. LLC*, 628 F.3d at 330–31; *Sec. & Exch. Comm'n v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 667 (6th Cir. 2001); *Forex Asset Mgmt. LLC*, 242 F.3d at 330–31.

The collateral order doctrine permits interlocutory review of a small class of collateral rulings: "only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (internal citation omitted).

Here, the district court's order satisfies these criteria. First, it conclusively determines the manner in which the Receivership Assets will be distributed. Second, it resolves an important question for injured investors that is separate from the merits question of whether Defendants committed securities fraud. And third, it would be unreviewable on appeal because the Receivership Assets "will be distributed, and likely

10

unrecoverable, long before the action brought by the SEC is subject to appellate review." *Forex Asset Mgmt. LLC*, 242 F.3d at 330. Thus, the district court's order affirming the Receiver's distribution plan is appealable pursuant to the collateral order doctrine.

B.

Turning to the merits, we review the decision below for abuse of discretion. *Wealth Mgmt. LLC*, 628 F.3d at 332–33. We may only reverse "if we have a definite and firm conviction" that there has been "a clear error of judgment." *Sec. & Exch. Comm'n v. Johnson*, 43 F.4th 382, 393 (4th Cir. 2022) (citation omitted). Because "most receiverships involve multiple parties and complex transactions," the district court's power to supervise a receivership is "extremely broad," and "appellate scrutiny is narrow." *Sec. & Exch. Comm'n v. Cap. Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005) (citation omitted); *Wealth Mgmt. LLC*, 628 F.3d at 332.

The goal of a receivership is "the fair distribution of the liquidated assets." *Wealth Mgmt. LLC*, 628 F.3d at 334. Of course, an "equitable plan is not necessarily a plan that everyone will like." *Sec. & Exch. Comm'n v. Vescor Cap. Corp.*, 599 F.3d 1189, 1195 (10th Cir. 2010) (internal citation omitted). Rather, it is a plan that "grant[s] fair relief to as many investors as possible." *Torchia*, 922 F.3d at 1311. To that end, receivers "have a duty to avoid overly costly investigations, and at a certain point, the costs of such individualized determinations outweigh the benefits." *Wealth Mgmt. LLC*, 628 F.3d at 336.

11

III.

Against this backdrop, we first consider the Dean Investors' objection. They advance several arguments to support their view that the district court abused its discretion in rejecting the Maximum Balance approach to the Rising Tide method. We address each in turn.

A.

First, the Dean Investors contend that in declining to apply the Maximum Balance approach, the court focused too much on lack of precedent. The Maximum Balance approach originated as dicta from the Seventh Circuit in *Securities and Exchange Commission v. Huber*, 702 F.3d 903 (7th Cir. 2012). There, investors who withdrew their investments from a Ponzi scheme challenged the receiver's application of the Rising Tide method. *Id.* at 904. The court rejected their arguments, but it found one hypothetical situation troubling: that "of an investor who having withdrawn some money from the Ponzi scheme then reinvests it." *Id.* at 907. The court devised a novel solution to that scenario, which it deemed the "Maximum Balance" approach:

> In cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme . . . should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored. Or so it seems to us; we can't find any discussion in case law or commentary of this "maximum balance" approach. We needn't pursue the issue.

*Id.* at 907–08.

In almost twelve years since *Huber*, no court has adopted the "Maximum Balance" approach, and the court below had no obligation to do so here. The Receiver determined

12

that more "Claimants will receive a greater distribution" under the Rising Tide method without the Maximum Balance calculations. J.A. 243. Therefore, the court did not abuse its broad discretion in approving the plan, even if it leaves the Dean Investors wanting more. *See Torchia*, 922 F.3d at 1311 (explaining that the purpose of "receiverships is to grant fair relief to as many investors as possible"). Thus, we find no error in the court's reasoning that there is "no precedent for this maximum balance approach." *Merrill*, Civil Action No. RDB-18-2844, 2022 WL 17582418, at *3.

### B.

Second, the Dean Investors argue that the court erred in concluding that the Maximum Balance approach would be administratively difficult. The court found that the approach requires "tracing the origin of all of the . . . funds for each reinvestment," and that "the sheer number of transactions" between the Dean Investors and Defendants rendered that impracticable. *Id.*

The Dean Investors, on the other hand, assure us that "tracing the flow of funds is not necessary." Dean Br. at 19. But that assertion is entirely unsupported. The court in *Huber* proposed the Maximum Balance approach for "an investor who having withdrawn some money from the Ponzi scheme then reinvests it"—"it" meaning the money the investor withdrew, not other funds. *Huber*, 702 F.3d at 907. And when describing the Rising Tide method generally, the court noted that "no part of whatever funds are recovered is property of any investor," because they are not "*traceable* to a particular investor." *Id.* at 906–07 (emphasis added). Thus, the district court did not abuse its discretion when it

13

determined that tracing the funds is necessary to implement the Maximum Balance approach.

Nor did it abuse its discretion when it held that doing so here would be administratively difficult. Together, the Dean Investors transacted with Defendants 76 times, with up to four months passing between their individual withdrawals and reinvestments. If the Receiver attempted to trace those funds, he would risk violating his "duty to avoid overly costly investigations" to the benefit of individual Claimants rather than the group. *Wealth Mgmt. LLC*, 628 F.3d at 336 (concluding that the district court acted "within its discretion to reject a case-by-case determination as too costly and time consuming"); *see also Cap. Consultants, LLC*, 397 F.3d at 745 (holding that the district court did not abuse its discretion in rejecting a calculation that "would impose a massive new administrative burden on the receiver").

Finally, we recognize that tracing the funds for M.C. Dean, in particular, may be manageable. After all, M.C. Dean maintained a separate bank account for transactions with Defendants, while CCWB commingled withdrawals from Defendants with other sources in a single bank account. However, the two investors are similarly situated, so they should be treated comparably. *See Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 754 (2d Cir. 2013) ("As the investors in both entities were . . . similarly situated, it was well within the district court's equitable authority to reject [one group's] requested premium distributions."). The Dean Investors are both institutional investors with the same manager, and they both invested, withdrew, and reinvested their capital in Defendants' scheme. So, we discern no error in the district court's finding of administrative difficulty.

14

## C.

Third, the Dean Investors insist that they derived no benefit from their reinvested withdrawals, so accounting for those withdrawals is unfair. Instead, they say, their reinvestments should be treated the same as their rolled-over distributions. To the contrary, we agree with the district court that when the Dean Investors withdrew their investments, "there was a benefit from that withdrawal, however big or small." *Merrill*, Civil Action No. RDB-18-2844, 2022 WL 17582418, at *3.

For example, CCWB had a larger pot of money from which to make credit card and tax payments than it would have enjoyed without the withdrawals. And at the very least, both of the Dean Investors had access to newfound cash. Unlike their rolled-over distributions, which were continually tied up in the scheme, the withdrawals gave them a choice to save, spend, or invest that cash. Accordingly, we see no error in the court's conclusion that the Dean Investors benefitted—however slightly—from their withdrawals.

After considering the Dean Investors' arguments, we are not left with "a definite and firm conviction" that there has been "a clear error of judgment." *Johnson*, 43 F.4th at 393. For that reason, we find no abuse of discretion in the district court's order overruling their objection.

## IV.

We next consider the Connaughton Investors' objection. They argue that the district court abused its discretion in approving the plan's Collateral Offset Provision. In their

15

view, the Receiver should not have considered third-party recoveries in the distribution plan, or at the very least, he should not have imposed a 100% offset.

In support, the Connaughton Investors principally rely on *Securities and Exchange Commission v. Capital Consultants, LLC*, 397 F.3d 733 (9th Cir. 2005), a Ninth Circuit case addressing a similar issue. There, defrauded investors complained about a 50% offset provision, "whereby each dollar received through third-party recoveries would reduce the distribution from the receiver by fifty cents." *Id.* at 738. They asserted a familiar argument—that the provision would discourage investors from pursuing third-party claims, which would count *against* them in a receiver's distribution. *Id.* at 741. The court, however, found that argument unpersuasive. *Id.* It had previously approved plans with 100% offset provisions, so surely, a 50% offset was acceptable. *Id.* at 740.

Like the Ninth Circuit, we are not compelled to find an abuse of discretion, even in the court's approval of a 100% offset. The Receiver determined that "[t]reating settlements and other similar recoveries as pre-Receivership withdrawals ensures" Claimants "are treated equally with respect to the total recovery of their principal investments." J.A. 221. And that makes sense. The Receiver has a finite amount of "pie," and he must decide how to slice it fairly. If the Collateral Recovery Cohort received some compensation through third-party settlements, and other Claimants received nothing, we see no issue prioritizing those Claimants who received nothing. We therefore decline to disturb the district court's order overruling this objection.

16

V.

"[W]hen funds are limited, hard choices must be made." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. Sec. & Exch. Comm'n*, 467 F.3d 73, 84 (2d Cir. 2006) (internal quotation marks omitted). Here, the district court diligently considered, and approved, those choices. In so doing, it remained well within its discretion. Accordingly, the order of the district court is

*AFFIRMED.*